**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | |
|---|---|
| NANETTE COLE AND BRUCE COLE, | ) ) ) |
| Appellants, | ) ) |
| v. | ) No. 2:13-cv-04200-NKL ) |
| BRUCE E. STRAUSS, TRUSTEE, | ) ) ) |
| Appellee. | ) |

## ORDER

This appeal is taken from an order and memorandum opinion of the Bankruptcy Court[1] granting Partial Summary Judgment on Counts I and III of the Trustee's Amended Complaint. The two counts at issue seek avoidance and recovery of allegedly fraudulent or preferential transfers made to the Defendants. Having considered all arguments of the parties, the Court treats the Bankruptcy Court's order as proposed findings of fact and conclusions of law and grants *de novo* summary judgment on Counts I and III.

## I.    Statement of Facts[2]

Mamtek US, Inc. was formed in May 2010 for the purpose of constructing and operating a sucralose manufacturing facility in Moberly, Missouri. Bruce Cole was the president and chief operating officer of Mamtek; Nanette Cole is married to Bruce Cole.

---

[1]    The Hon. Dennis R. Dow.
[2]    The facts recited are for purposes of this litigation, only, and are undisputed either because the Coles did not respond to them, or because any response filed failed to include admissible evidence raising a relevant dispute.

The City of Moberly agreed to finance the construction of the facility through the issuance of approximately $39 million in bonds.

As part of the bonding process, Bruce Cole signed a due diligence questionnaire on behalf of Mamtek in June 2010. The content of this document reflects that Mamtek would need to spend about $48 million on the project, including about $23.6 million for acquisition of machinery and equipment. [Appx.[3] 133, pp. 20-22, ¶¶ 73-75.] A month later, on July 19, 2010, Cole signed a management agreement including a budget on behalf of Mamtek, which was submitted to the City of Moberly's bond counsel. [Appx. 133, pp. 22-23, ¶¶ 76-78.] The budget reflected higher costs for the project than the due diligence report Cole signed the previous month: $33 million for the construction of the manufacturing facility alone; $5.7 million to construct the building housing the manufacturing facility; $24.6 million to build the actual sucralose production lines; and $2.6 million to construct roads and provide for utilities [Appx. 133, p. 23, ¶ 79], about $68 million in total.

Mamtek had access to bond proceeds of about $33 million and over time obtained about $3.8 million in loans. [Appx. 133, pp. 10-12, ¶¶ 34, 35, 39, and 41; p. 19, ¶ 70.] Its liabilities, including $39 million in principal, interest and fees to repay the bonds; $3.8 million to repay the loans; and the budgeted $68 million to complete the project, totaled at least $110 million. In fact, Mamtek never had enough money to complete the project and never produced any product. It ran out of funds and ceased business in September 2011 in possession of few assets and with substantial debt.

---

[3] "Appx." refers to documents filed in the adversary proceeding below, no. 12-02009-drd; "Doc." refers to documents filed in this case, no. 2:13-cv-04200-NKL.

Prior to its demise, Mamtek was given part of the bond proceeds. To access bond funds, Mamtek was required to submit requests to the City of Moberly. Each request had to be accompanied by a form signed by a representative of Mamtek, stating that the funds were necessary for construction of the facility, along with a spreadsheet identifying recipients and proposed disposition of the funds, and copies of the invoices supporting each item listed on the spreadsheet. Moberly reviewed the requests, determined whether the amounts were payable and, if so, forwarded the requests to United Missouri Bank, N.A., which held the bond proceeds as trustee. The bank then disbursed the funds as specified in the draw requests.

On July 23, 2010, Mamtek submitted a draw request to Moberly in the amount of $4,062,500 for services allegedly rendered to Mamtek by Ramwell Industries, Inc. The draw request contained instructions for electronic transfer of funds to the bank account of Mamtek as payee. Mamtek did not owe $4,062,500 to Ramwell and never intended to pay $4,062,500 to Ramwell. The Ramwell corporation never provided any goods or services to Mamtek, and was never even formed.

Bruce Cole, as Mamtek's president and CEO, participated in discussions about the July 23 request and received email communications about it. He claims that Ramwell was used as an accounting mechanism into which to place Mamtek's operational costs; but Ramwell was never formed, and never had any employees, money or property; and that he knew Ramwell never provided any goods or services to Mamtek. [Appx. 133-77, pp. 275-77, 290.]

The Coles received proceeds from the first draw request, specifically, one transfer

in the amount of $204,167 and another in the amount of $700,000, which were made on July 30, 2010 by wire transfer from Mamtek's bank account into Nanette Cole's California bank account. The Coles were married and lived in California at the time. California is a community property state and Bruce Cole admits he had an interest in the money transferred to Nanette Cole. [Appx. 133, pp. 54-55, ¶¶ 209-212.] Nanette Cole never provided any services to Mamtek. [Appx. 133, p. 56, ¶ 219.]

Bruce Cole testified that the $204,167 and $700,000 transfers represented compensation to him for his services in exploring the building of the Mamtek facility in the U.S., and payment for raising money for Mamtek, respectively. [Appx. 133, pp. 54-56, ¶¶ 213-214, 217.] He also testified that the $700,000 portion of the transfer was paid to him on account of the termination of a contract between Mamtek and Ramwell. At the time of the $904,167 transfer, the Coles had been without income for a period of several months and were in default on the mortgage on their Beverly Hills home, which was scheduled for a foreclosure sale in August. The Coles used at least part of the transfer to pay their mortgage.

On March 25, 2011, nine months before the involuntary Chapter 7 was filed, Mamtek paid $360,000 to Bridgeway Capital for the benefit of Bruce Cole. A few days prior to the payment, Cole had directed Bridgeway Capital to transfer, upon receipt, the majority of the anticipated payment to counsel for one of Cole's judgment creditors. Cole later testified that the funds were payment for services he rendered to Mamtek in connection with obtaining funding for the Mamtek project. [Appx. 133, p. 57-59, ¶¶ 230-239.] At the time the Chapter 7 petition was filed, Mamtek's debts exceeded $47 million

and its assets were less than $2,000.  [Appx. 133, p. 12, ¶ 44.]

The Bankruptcy Trustee alleges that the transfers on June 30, 2010 to Nanette Cole were fraudulent [Count I].  He alleges the March 25, 2011 transfer of funds to Bridgeway Capital was a preferential transfer [Count III].  He seeks to set both transfers aside.

## II.    Jurisdiction

This Court has jurisdiction under 28 U.S.C. §158(a)(1) and 28 U.S.C. § 1334(a) and (b).

## III.   Issues on Appeal

The Coles raise ten issues:

1.    Did the Bankruptcy Court err in denying [the Coles'] Motion to Stay Proceedings?
2.    Did the Bankruptcy Court err in granting partial summary
       judgment to the [Trustee] on Count 1 of the First Amended Complaint?
3.    Did the Bankruptcy Court err in granting partial summary
       judgment to the [Trustee] on Count 3 of the First Amended Complaint?
4.    Did the Bankruptcy Court err in excluding the Pellegrino
       Report from the record on summary judgment?
5.    Did the Bankruptcy Court err in denying extensions of sufficient length to enable necessary discovery or preparation under the circumstances?
6.    Did the Bankruptcy Court err in denying [the Coles'] Motion to Amend or Make Additional Findings of Fact; to Alter or Amend the Judgment; and for New Hearing?
7.    Did the Bankruptcy Court err in not advising [the Coles] of their right or opportunity to have the proceedings heard before an Article III judge?

8.  Does the Bankruptcy Court have the authority to hear this
    matter as a non- Article III judge?
9.  Does the Bankruptcy Court have the authority to enter
    judgment or to issue findings of fact and conclusions
    of law in this matter?
10. Does the Bankruptcy Court have jurisdiction over the
    proceeds located in California which are the proceeds
    of the sale of the [Coles'] residence?

[Doc. 15, pp. 22-23.]

## IV.    Standard of Review

The abuse of discretion standard of review applies to Issues 1, 4 and 5. *See Lunde v. Helms,* 898 F.2d 1343, 1345 (8th Cir. 1990) (abuse of discretion standard applies to denial of stay of civil proceedings); *Brunsting v. Lutsen Mts. Corp.,* 601 F.3d 813, 818 (8th Cir. 2010) (exclusion of evidence from summary judgment record reviewed for abuse of discretion); and *Rakes v. Life Investors Ins. Co. of Am.,* 582 F.3d 886, 893 (8th Cir. 2009) (applying abuse of discretion standard to denial of a motion for extension of time to respond to summary judgment).

Issues 2, 3, and 6-10 are reviewed under a *de novo* standard. *See In re Martin,* 140 F.3d 806, 807 (8th Cir. 1998) (a bankruptcy court's legal conclusions are reviewed *de novo*); and *In re. Maness,* 497 B.R. 326 (8th Cir. BAP 2013) (summary judgment entered by bankruptcy court is reviewed *de novo*, citing Fed. R. Civ. Proc. 56(c)).

## V.    Discussion

### A. Issues 7, 8, and 9 relating to the Bankruptcy Court's authority

The Bankruptcy Court held that it had jurisdiction to enter a final judgment notwithstanding any limitation announced in *Stern v. Marshall*, 131 S.Ct. 2594 (2011). It

also found that the Coles had impliedly consented to the Bankruptcy Court's jurisdiction to enter a final judgment, by failing to object at any time during the proceedings. [*Id.*] Finally, the Bankruptcy Court designated its order as proposed findings of fact and conclusions of law, subject to *de novo* consideration by a District Court. [*Id.*]

Relying on *Stern*, the Coles argue that because the Bankruptcy Court is not an Article III court, it had no constitutional authority to enter a final judgment and it should have advised them that they had a right to have an Article III judge decide the case instead of a bankruptcy judge. The Coles also contend that the Bankruptcy Court had no authority to issue proposed findings of fact and conclusions of law in the alternative.

The two counts at issue on this appeal are statutorily designated as core proceedings under 28 U.S.C. § 157(b)(2)(F) and (H). In *Stern,* however, the U.S. Supreme Court held that not all core proceedings can be finally resolved by a bankruptcy court. Specifically, a common law counterclaim cannot be finally resolved by a bankruptcy court even though the bankruptcy court has statutory authority to do so when the counterclaim cannot be resolved in the process of ruling on a creditor's proof of claim. Such claims are reserved by the U.S. Constitution to Article III judges.

It is an open question whether fraudulent transfers or preferential transfers are *Stern* claims precluding bankruptcy court jurisdiction. *See Exec. Benefits Ins. Agency v. Arkison,* 134 S.Ct. 2165, 2170 n.4 (Jun. 9, 2014). In *Executive Benefits,* the Supreme Court did not resolve this question but did assume that such claims are reserved to Article III judges. The Supreme Court also declined to determine whether consent, either express or implied, ever gives bankruptcy judges jurisdiction to enter a final judgment on

a *Stern* claim. But it did find that a bankruptcy judge was authorized to submit proposed findings of fact and conclusions of law subject to *de novo* review by the district court.

Following the lead of the U.S. Supreme Court, the Court will treat the Bankruptcy Court's order as proposed findings of fact and conclusions of law and adopts those findings *de novo* as explained in this Order.

The Coles also argue that the Bankruptcy Court erred in failing to advise them of their right to an Article III judge to adjudicate the claims under § 157(b). The Coles cite no authority that supports their specific argument and the Court concludes it lacks merit.

### B. Issue 2, grant of summary judgment on Count 1

In Count 1, the Trustee seeks to recover $904,167 transferred from Mamtek to the Coles on July 30, 2010. The Trustee contends that the two transfers involved were either actually fraudulent or constructively fraudulent.

Section 548 of the Bankruptcy Code permits a trustee to avoid transfers of a debtor's property made in the two years prior to the commencement of a bankruptcy case, if the transfer was fraudulent or constructively fraudulent. A transfer is actually fraudulent if it is made by a debtor "with actual intent to hinder, delay, or defraud" a creditor. 11 U.S.C. § 548(a)(1)(A); *see, e.g. In re Petters Co., Inc*., 499 B.R. 342, 349 (Bankr. D. Minn. 2013). Constructive fraud occurs when the transfer was made in exchange for less than reasonably equivalent value and at a time when a debtor is insolvent, had unreasonably small capital, or intended to incur debts beyond its ability to pay. 11 U.S.C. § 548(a)(1)(B); *see, e.g., In re Lumbar*, 457 B.R. 748, 753 (8th Cir. B.A.P. 2011).

There is no dispute that the July 30 transfers were made in the two years prior to

the commencement of Mamtek's bankruptcy. Therefore the only issue in dispute as to Count I is whether the transfers were actually or constructively fraudulent.[4]

### 1. Actual intent to defraud

It is the intent of Mamtek, the debtor, that must be established to show that the transfers totally $904,167 were done with actual intent to defraud. Because a corporation can only act through its officers and employees, the intent of Bruce Cole, Mamtek's Chief Executive Officer, is attributable to Mamtek. *See In re Personal and Business Ins. Agency,* 334 F.3d 239, 242-43 (3rd Cir. 2003) (fraud of corporate officer is imputed to corporation when officer's fraudulent conduct was in the course of employment and for the benefit of the corporation, even if officer's conduct was unauthorized, or effected for officer's own benefit but clothed with apparent authority of the corporation). *See also In re. WL Homes LLC,* 452 B.R. 138, 147 (Bankr. D. Del. 2011) (if president, vice president or director of corporation has knowledge or notice of a fact, such knowledge or notice is generally imputed to corporation) (citing *In re Pubs, Inc. of Champaign,* 618 F.2d 432, 438 (7th Cir. 1980)).

The undisputed facts show that Bruce Cole participated in discussions about the

---

[4]     Nanette Cole also argues that fraud, as a special matter, was not sufficiently pleaded for purposes of Fed. R. Civ. Pro. 9, because the Trustee's complaint did not use the word "insider" in describing her. [Doc. 16, p. 12; Doc. 19, p. 18.] Rule 9(2)(b) does not require the use of magic words; it merely requires that the pleader state with particularity the circumstances constituting fraud. The Trustee's first amended complaint describes the circumstances with particularity. Further, Nanette Cole never filed a timely objection below and therefore has waived any objection. *See Lasercomb America, Inc. v. Reynolds,* 911 F.2d 970, 980 (4th Cir. 1990); *Davsko v. Golden Harvest Products, Inc.,* 965 F. Supp. 1467, 1474 (D. Kan. 1997); and *United Nat. Records, Inc. v. MCA, Inc.,* 609 F. Supp. 33, 38 (D.C. Ill. 1984).

submission of the first draw request.  He was aware of its content because he received email communications concerning the preparation and submission of the request.  He also spoke personally with David Ho, a Mamtek officer, about the submission of the invoice. The Coles cite no admissible, relevant evidence to contradict Bruce Cole's role in the preparation and submission of the invoice.  Further, the undisputed evidence shows Bruce Cole knew the representations made in the first draw request were false.  Mamtek submitted its first draw request to Moberly for an invoice purporting to be from Ramwell Industries Inc., with an address in Hong Kong.  The invoice, dated July 21, 2010, was in the total amount of $4,062,500 and listed the following services allegedly rendered by Ramwell for Mamtek:  $3,562,500 for "Deposit: Design, acquisition and installation of five production lines"; $325,000 for "Production line[s]:  Engineering and Design"; and $175,000 for "Production Line:  Project Supervision, Project Coordination." [Appx. 133-2, p. 28.]  Bruce Cole knew that Mamtek did not owe $4,062,500 to Ramwell and never intended to pay $4,062,500 to Ramwell.  He knew that Ramwell Industries Inc. had never been formed; never had any employees, property or money; and never provided any goods or services to Mamtek.

Further, Bruce Cole offered conflicting explanations for the transfers.  On one hand, he testified that the transfers represented compensation to him for his services in exploring the building of the facility in the U.S. and payment for raising money for Mamtek.  He also testified that the $700,000 portion of the transfer was paid to him on account of the termination of a contract between Mamtek and Ramwell, under which Ramwell had the right to build five 60-ton sucralose lines in China.   But the transfer to

Ramwell was made four months before the alleged termination of the contract, there is evidence that the "termination of a contract" was a fabrication, contract termination is not even the reason given by Mamtek for the draw request, and Mamtek's stated reasons for the draw request are indisputably false. Finally, no amounts were paid to Ramwell from the draw request after it was paid to Mamtek. Instead, the money was paid to officers and directors of Mamtek including Bruce Cole, and to his wife, Nanette Cole. On this record, a reasonable fact finder could only conclude that Mamtek intended to defraud when it submitted the Ramwell invoice to Moberly and then transferred $904,167 to the Defendants.

In addition to there being overwhelming direct evidence of an intent to defraud, the record shows sufficient "badges of fraud" to create an inference of actual fraud. Because it is difficult to obtain direct evidence of fraudulent intent, the courts sometime look for a confluence of badges of fraud from which to infer actual fraud. *See In re Addison*, 540 F.3d 805, 811 (8th Cir. 2008); *see also In re. Gaven,* 936 F.2d 378, 383 (8th Cir. 1991). "Once a trustee establishes a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent…. In such cases, 'the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue.'" *Kelly v. Armstrong*, 141 F.3d 799, 802 (8th Cir. 1998) (quoting *In re Acequia*, 34 F.3d 800, 806 (9th Cir. 1994)).

A recognized badge of fraud is a transfer to an insider. Bruce Cole, as Mamtek's Chief Executive Officer, was an insider, as was his wife, Nanette Cole. *See* 11 U.S.C. § 101(31) ("insider" includes corporate officers and their relatives).

Another badge is inadequate consideration for the transfer. The invoice submitted by the debtor was for specific services performed by Ramwell, but Ramwell never performed any services and in fact did not exist, and no funds were ever paid to Ramwell. The transfers were therefore for inadequate consideration.

Finally, insolvency of the transferor is a badge of fraud. Courts apply a "balance sheet test" to determine solvency under 11 USC §§ 547 and 548. *In re Prime Realty, Inc*., 380 B.R. 529, 534-37 (8th Cir. 2007). Under the balance sheet test "a debtor is insolvent if the sum of its debts is greater than all of its property, fairly valued." *Jones Truck Lines, Inc. v. Full Service Leasing Corp*., 83 F.3d 253, 258 (8th Cir. 1996). "Fair valuation is generally defined as the going concern or fair market price…. If…a company is on its deathbed, assets should be valued on a liquidation basis." *In re Payless Cashways, Inc*. 290 B.R. 689, 699 (Bankr. W.D. Mo. 2003) (internal quotations and citations omitted).

Mamtek never earned any income and was never a going concern. Mamtek at one time had assets totaling almost $37 million. Its liabilities totaled at least $110 million. The Coles did not challenge these figures in response to the motion for summary judgment below and do not do so now. [*See* Doc. 19, p. 4.] Rather, they argue that the Bankruptcy Court should have considered the Pellegrino Report which, they claim, showed Mamtek had additional assets of approximately $52 million in value. There are numerous problems precluding admissibility of the Pellegrino Report and as discussed below, the Bankruptcy Court did not abuse its discretion in excluding it. But even adding $52 million in additional assets to what Mamtek had, its assets totaled no more than

$89 million and its liabilities totaled at least $110 million.  Mamtek was always insolvent.

The Coles also argue that at the time of the first draw request, they did not know Bruce Cole's $33 million estimate of the cost of construction for the manufacturing facility was too low, and therefore could not at the time have known Mamtek was insolvent.  The undisputed facts demonstrate otherwise.  According to the July 19, 2010 management agreement and budget that Bruce Cole signed on behalf of Mamtek, the $33 million for constructing the manufacturing facility itself represented only part of Mamtek's costs in connection with the project.  His budget reflected that the project would cost almost $110 million in total, well in excess of any projection of the company's assets.

Because the undisputed facts establish a confluence of badges of fraud, there is a presumption of fraudulent intent, shifting "the burden…to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue.'"  *Kelly*, 141 F.3d at 801-802.  Proving a legitimate supervening purpose is a "a heavy burden:  The burden which shifts...is not a burden of going forward with the evidence requiring the [transferee] to explain away natural inferences, but a burden of proving that he has not committed the objectionable acts with which he has been charged."  *In re Northgate Computer Systems, Inc.*, 240 B.R. 328, 360 (Bankr. D. Minn. 1999); *accord In re Eubanks*, 444 B.R. 415, 424-25 (Bankr. E.D. Ark. 2010).

The Coles argue that a legitimate supervening purpose negates any badges of fraud [Doc. 16, p. 11].  But as discussed above, the undisputed facts show that the transfer of the proceeds was based on a false draw request and invoice.  The Coles cannot meet their

burden given that fact.

The Court finds as a matter of law that the July 30, 2010 transfer to the Defendants in the amount of $904,167 was fraudulent.

### 2. Constructive Fraud

The undisputed facts also demonstrate that the July 30, 2010 transfers were constructively fraudulent.

Under § 548(a)(1)(B), a constructively fraudulent transfer is established when the debtor received less than a reasonably equivalent value in exchange for the transfer, and at least one other factor is shown, including insolvency of the debtor at the time of the transfer, or that the debtor was engaged in business for which any property remaining with the debtor was an unreasonably small amount of capital.

Mamtek, the debtor, received no reasonably equivalent value for the $904,167 transfer. Ramwell was a non-existent entity that never provided any services to Mamtek and had no contract with Mamtek. The transfer was not used to pay for services rendered to Mamtek by Ramwell. Further, the transfer was directed to Nanette Cole, who never rendered any services to Mamtek.

Mamtek was insolvent at the time of the transfer, as discussed above. The transfer was also made at a time when Mamtek had an unreasonably small amount of capital, inasmuch as it never had sufficient capital to complete the project.

Therefore, the undisputed facts show that the transfer was constructively fraudulent under § 548(a)(1)(B).

The Trustee is entitled to summary judgment with respect to Count 1.

## C.    Issue 3, grant of summary judgment on Count 3

In March 2011, at the direction of Bruce Cole, Mamtek transferred $360,000 to an account maintained by him at Bridgeway Capital Limited.   The undisputed facts showed that the transfer is avoidable as a preferential transfer.

For a transfer to be subject to avoidance as a preference under 11 U.S.C. § 547(b),

1.    there must be a transfer of an interest of the debtor in property,
2.    on account of an antecedent debt,
3.    to or for the benefit of a creditor,
4.    made while the debtor was insolvent,
5.    [between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider],
6.    that left the creditor better off than it would have been if the transfer had not been made and the creditor asserted its claim in a Chapter 7 liquidation.

*Wells Fargo Home Mortgage, Inc. v. Lindquist*, 592 F.3d 838, 842 (8th Cir. 2010) (quoting *Buckley v. Jeld–Wen, Inc.* (*In re Interior Wood Prods. Co.*), 986 F.2d 228, 230 (8th Cir.1993)).

There is no dispute that the Bridgeway transfer was made for Bruce Cole's benefit, between 90 days and one year before the filing of the bankruptcy petition.  Cole testified that the transfer was for an antecedent debt allegedly owed him by Mamtek for his services. Cole benefitted from receiving the transfer rather than asserting a claim as a creditor.  As of the time the Chapter 7 petition was filed, Mamtek's debts exceeded $47 million and its assets were less than $2,000.  As discussed above, the undisputed facts show Mamtek was insolvent.

In opposition to summary judgment, Cole pointed to his affirmative defense of

contemporaneous exchange for new value under 11 U.S.C. § 547(c)(1). [Doc. 16, pp. 12-13.]  To establish this defense, "the recipient of the transfer must show by a preponderance of the evidence that both parties intended the transfer to be a contemporaneous exchange for new value and that the exchange was, in fact, contemporaneous." *In re Dorholt, Inc.*, 239 B.R. 521, 523 (8th Cir. B.A.P. 1999).  Cole argues that he procured an investment subscription agreement for Mamtek in the amount of $10,000,000 on or before April 1, 2011, and that his procurement of this agreement was in exchange for the $360,000 transfer.  [Doc. 16, pp. 12-13; Doc. 19, p. 21.]

But an affirmative defense may be waived when not raised in response to a properly supported motion for summary judgment.  *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) (finding party waived affirmative defense of immunity by not raising it in response to a summary judgment motion); Fed. R. Civ. Proc. 56(e) (party opposing motion for summary judgment must properly address moving party's assertions of fact).  The Trustee's motion was properly supported, and Cole did not demonstrate that the affirmative defense applied or even raise it.  [Appx. 200, p. 19, n. 36.]  The defense is waived.

Even now, Cole does not point to properly supported facts in the record demonstrating the applicability of the defense.  He complains he lacked access to the original records he needed to prove the investment. [Doc. 16, pp. 12-13.]  But such records would not be the exclusive means of demonstrating Cole accomplished what he says he accomplished.  For example, Cole could have offered his own affidavit. He in fact filed one, concerning other matters, with his response to the summary judgment

motion.  [Appx. 186-1.]   But he did not address the alleged investment he claims to have procured or present any other evidence of it or what happened to the money.

The Trustee is entitled to summary judgment on Count 3.

### D.    Issue 1, denial of stay of proceedings

The Bankruptcy Court did not abuse its discretion in denying the Coles a stay of the adversary proceedings during Bruce Cole's incarceration.

"[T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants*." Landis v. N. Am. Co*., 299 U.S. 248, 254 (1936).  A defendant has no constitutional right to a stay of a civil proceeding simply because a parallel criminal proceeding is ongoing.  *U.S. v. Kordel*, 397 U.S. 1, 11 (1970).  Instead, the decision to stay civil proceedings when parallel criminal proceedings are pending is made at the discretion of the trial court, *Keating v. Office of Thrift Supervision*, 45 F.3d 322, 324 (9th Cir. 1995), when it determines that "the interests of justice" require such a stay, *Kordel*, 397 U.S. at 11.

In addressing the Coles' motion for a stay, the Bankruptcy Court applied the tests set out in *Koester v. American Republic Investments, Inc*., 11 F.3d 818, 823 (8th Cir. 1993), and *Fidelity Nat. Title Ins. Co. of New York v. National Title Resources Corp*., 980 F. Supp. 1022 (D. Minn. 1997).   *Koester* is the leading case in the Eighth Circuit concerning the stay of a civil proceeding when a factually related criminal proceeding is pending. The court held that under such circumstances, a stay

is sometimes warranted. . . . However, a civil defendant cannot hide behind a blanket invocation of the Fifth Amendment privilege. Therefore, to warrant a stay, defendant must make a strong showing either that the two proceedings are so interrelated that he cannot protect himself at the civil trial by selectively invoking his Fifth Amendment privilege . . . or that the two trials will so overlap that effective defense of both is impossible.

11 F.3d at 823.

In *Fidelity National,* the court articulated a five-factor test, which represents the approach the majority of courts have taken in deciding whether to stay civil proceedings. *See Microfinancial*, 385 F.3d at 78 (summarizing cases). The five factors are:

1. the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay;
2. the burden which any particular aspect of the proceedings may impose on defendants;
3. the convenience of the court in the management of its cases, and the efficient use of judicial resources;
4. the interests of persons not parties to the civil litigation; and
5. the interest of the public in the pending civil and criminal litigation.

*Fidelity Nat.*, 980 F. Supp. at 1024.

With respect to *Koester,* the Bankruptcy Court held that the Coles had not demonstrated substantial overlap between the adversary and criminal proceedings. [Appx. 129, p. 31-32.] The Coles do not explain how the cases overlapped so that effective defense of both was impossible, let alone make the "strong showing" that *Koester* requires, nor how the two proceedings were so interrelated that Cole could not protect himself in the adversary proceeding by selectively invoking his Fifth Amendment

privilege. *See* 11 F.3d at 823.

The record also refutes such overlap or interrelationship. For example, prior to the adversary proceeding, Bruce Cole gave sworn testimony regarding the Mamtek project in a proceeding before the SEC, was advised that he could invoke his Fifth Amendment rights, and did not do so. [Appx. 133-157, pp. 1 and 7.] When the Trustee deposed him in connection with the adversary proceeding, Cole selectively invoked the Fifth Amendment. [Appx. 133-76, pp. 275-317, and 322-345.] The Bankruptcy Court acknowledged that an adverse inference could be drawn from a party's civil invocation of the Fifth Amendment. [Appx. 200, p. 8 n.10.] But its order makes scant or no reference to facts based on such adverse inferences, and the record contains ample undisputed facts, separate from facts evidenced through adverse inferences, demonstrating the Trustee's entitlement to summary judgment. This Court has relied on those facts as well.

The Bankruptcy Court's careful application of the five-factor *Fidelity* test and detailed explanation of the reasons why the court concluded no stay was appropriate further demonstrate that the court did not abuse its discretion in denying a stay. The Bankruptcy Court noted the Trustee had a strong interest in the Coles' funds held in escrow which could be subject to competing claims, had a concern about the Coles dissipating their assets, and the cost to the bankruptcy estate of delay. The length of the criminal proceedings was indeterminate. [Appx. 129, pp. 32-33.]

The Bankruptcy Court also analyzed the burden on the Coles of not granting a stay. The Bankruptcy Court reiterated that the Coles had not demonstrated there was a substantial overlap between the adversary and criminal proceedings; and that the Coles

had not demonstrated there was evidence they would wish to introduce in the civil adversary proceeding, but which they could not because of the parallel criminal proceeding. [Appx. 129, pp. 34-35.] The Bankruptcy Court also acknowledged that the Coles had raised a concern about other witnesses being reluctant to testify because of possible criminal repercussions, but found that such an argument was speculative. [Appx. 129, p. 34.] Additionally, the Bankruptcy Court found it significant that the burden on the Coles was minimized because at the time they requested the stay, only a month and a half remained for discovery in the adversary proceeding, and the Trustee represented that he would neither elicit further testimony from Bruce Cole nor raise Fifth Amendment issues in discovery [Appx. 129, pp. 34-35], and in fact, the record reflects that the Trustee did not.

The Bankruptcy Court also analyzed the burden imposed on the Coles as a result of Bruce Cole's incarceration. It acknowledged that there would be limitations on Bruce Cole's ability to communicate from prison, but found such a limitation unconvincing as a justification to stay the adversary proceeding for two reasons. First, defendants in criminal actions often have the same impediments to communication as Bruce Cole as a result of pre-trial incarceration, and those matters are not stayed; and second, there was no indication of when Cole's incarceration would end. [Appx. 129, p. 35.] In addition, the Bankruptcy Court accommodated many of the Coles' requests for extensions of time to respond to the Trustee's motion for summary judgment. The court granted them 102

days in total (81 more than permitted by local rule) in which to respond.[5]   Both of the

Coles are also licensed attorneys [Appx. 141, p. 1, n.2; 217, p. 2].  Finally, though the

Coles argued in their filings that they did not have access to general sorts of information,

they never filed a Rule 56(d) affidavit seeking more time to perform discovery; sought to

_____

[5]       In total, the Coles filed eight separate motions that included requests for extra time to respond to the summary judgment motion, and as discussed above, the Coles were granted extensions.  That the Coles were able to file the plethora of motions in fact begs the question of how they were prejudiced by lack of a stay. The various motions and rulings are listed below:

- Appx. 135, p. 5 (motion requesting extension to February 12, 2013 to respond to summary judgment motion);
- Appx. 137 (order granting extension to February 12);
- Appx. 141, p. 13 (motion requesting extension of all pending deadlines to June 2013);
- Appx. 153, p. 5 (motion requesting extension of time to indeterminate date after February 12, 2013);
- Appx. 159 (order granting extension to respond to summary judgment motion to February 26, 2014);
- Appx. 161, p. 4 (motion to extend time to respond to summary judgment motion to March 26, 2013);
- Appx. 163 (order granting extension to respond to summary judgment motion to March 12, 2013);
- Appx. 167, p. 4 (motion to reconsider order granting extension to March 12);
- Appx. 168 (order granting extension to March 19, 2013 to respond to summary judgment motion);
- Appx. 172, p. 2 (renewed motion to reconsider seeking extension of time to March 26, 2013);
- Appx. 173 (order denying renewed motion to reconsider seeking extension to March 26, 2013);
- Appx. 176, p. 5 (motion seeking reconsideration of order denying motion to reconsider and request for additional time to respond to summary judgment motion);
- Appx. 177, p. 4 (order extending time to respond to summary judgment motion to April 12, 2013);
- Appx. 181, p. 4 (motion requesting extension to May 3, 2013); and

Appx. 183 (order denying request for extension to May 3).

compel the production of any information in particular; nor informed the Bankruptcy Court of what in particular they needed to respond to the motion for summary judgment.[6]

As for the final two elements of the test, the interests of persons not parties to the civil litigation, and the interest of the public in the pending civil and criminal litigation, the Bankruptcy Court concluded that the creditors of the Mamtek estate had an interest in a quick resolution of the adversary proceeding and that the public at large had as much interest in seeing a determination of the claims in the adversary proceeding in the Bankruptcy Court as in any other forum. [Appx. 129, p. 36.]

The Bankruptcy Court did not abuse its discretion in denying a stay.

---

[6]    The Coles filed their response to the summary judgment motion on April 12, 2013. Four days later, on April 16, 2013, they filed a motion for a protective order regarding an appraisal report of certain assets in which Mamtek U.S. allegedly has an interest, the so-called "Pellegrino Report." [Appx. 188.] The Bankruptcy Court denied their motion. [Appx. 192.] On May 31, 2013, the Coles filed a motion asking the court to reconsider its denial, and asking the court to direct the Trustee to provide a waiver of confidentiality to a third party so that the Coles could obtain a copy of it from that third party. [Appx. 196, p. 4.] The Bankruptcy Court denied the motion to reconsider. [Appx. 197.]

The Coles' motions of April 16 and May 31, 2013 are the only ones in which the Coles made any specific note of any inability to respond a particular statement of fact. The two motions were not filed in connection with any request to extend the time to respond to the Trustee's motion for summary judgment, and were filed a month and a half after the Coles filed their suggestions in opposition to the motion for summary judgment. Further, according to the correspondence attached to their motion to reconsider the denial of their motion for protective order, the Coles requested the document from the third party on April 10, 2012, two days before their suggestions in opposition to the motion for summary judgment were due. [Appx. 196, p. 9.] In other words, the Coles knew of the existence of the report at the time they were preparing their response to the Trustee's motion for summary judgment, but did not at the time claim to have required it in order to respond to the summary judgment motion.

**E. Issue 5, denial of requests for extension of time to perform additional discovery and prepare response to motion for summary judgment**

The Bankruptcy Court did not abuse its discretion in denying the Coles additional time to respond to the Trustee's motion for summary judgment.

Rule 56 of the Federal Rules of Civil Procedure applies to bankruptcy proceedings pursuant to Fed. R. Bankr. Proc. 7056. "Under Rule 56(f) [now 56(d)], a party opposing summary judgment may seek a continuance and postpone a summary judgment decision, but the party opposing summary judgment is required to file an affidavit with the district court showing what specific facts further discovery might uncover." *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 685 (8th Cir. 2012) (internal quotation and citation omitted).

A trial court's denial of a request to extend time to respond to a motion for summary judgment will be upheld "if the nonmoving party was not deprived of a fair chance to respond to the summary judgment motion." *Brown v. J.B. Hunt Transp. Svs., Inc*., 586 F.3d 1079, 1084 (8th Cir. 2009) (internal quotation and citation omitted). As noted above, appeal from such denial is reviewed for abuse of discretion. *Rakes,* 582 F.3d at 893.

The Coles never filed the required Rule 56(d) affidavit in order to extend the time for response to the motion for summary judgment to gather additional evidence. Such failure, by itself, was sufficient cause for the Bankruptcy Court to deny the Coles' requests for extensions.

Further, the Coles were not "deprived of a fair chance to respond to the summary judgment motion." *Brown*, 586 F.3d at 1084. They stipulated to the discovery deadline

in the scheduling order entered by the Bankruptcy Court. They also had every chance to respond to the Trustee's motion for summary judgment, as evidenced by their filing of their own motions. They sought several extensions of time to respond and in all, were granted a total of 102 days in which to respond, almost five times the 21 days for response provided by Local Rule 9013-1.H.3, U.S. Bankr. Ct. W.D. Mo. The fact that one of the Coles was incarcerated for some portion of the time the summary judgment motion was pending did not deprive them of a fair chance. Bruce Cole's incarceration may have made the task of responding more cumbersome than it otherwise would have been, but any such difficulty should have been remedied by the Bankruptcy Court's grant of additional time, particularly in view of the face that Nanette Cole was not incarcerated, and both Coles are licensed attorneys.

The Bankruptcy Court did not abuse its discretion in refusing to grant the Coles more time to respond to the motion for summary judgment.

**F.     Issue 4, exclusion of Pellegrino report**

The Bankruptcy Court did not abuse its discretion in refusing the Coles' offer of the Pellegrino Report.

First, the report was not authenticated. Rule 56(c)(2) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings by Rule 7056 of the Federal Rules of Bankruptcy Procedure, provides that a party may object to material cited in support of factual disputes if it is not presented in a form that would be admissible in evidence. The report was not self-authenticating, nor was it accompanied by an affidavit or excerpt from deposition testimony. This was particularly problematic because the report was marked

as a draft and was not dated.

Second, the opinion provided in the report is hearsay. Hearsay cannot defeat summary judgment. *Knutson v. Schwan's Home Serv., Inc.*, 711 F.3d 911, 914-15 (8th Cir. 2013).

Finally, the report has little or no probative value and considering it would have been a waste of time. Fed. R. Evid. 403. In purporting to value Mamtek's intellectual property at $52 million, the report is premised on an assumption, demonstrated by the undisputed facts to be incorrect, that Mamtek had completed and was operating the sucralose manufacturing facility. In fact, there is no evidence that Mamtek was capable of ever raising sufficient capital to get the project up and running.

The Coles argue that the report evidences additional Mamtek assets—certain intellectual property rights leased by Mamtek, having an alleged value of $52 million— and establishes a dispute of fact regarding Mamtek's insolvency. But as noted above, even if the Bankruptcy Court had considered it, adding the $52 million figure to the asset side of the calculation does not create a genuine dispute of material fact with respect to the Trustee's evidence that Mamtek was insolvent. Its liabilities would still have exceeded its assets by at least $20 million.

The Bankruptcy Court did not abuse its discretion in refusing to consider the report.

**G. Issue 6, denial of motion to amend or for new hearing, and Issue 10, Bankruptcy Court jurisdiction over proceeds of sale of the Coles' residence**

Issues 6 and 10 on appeal are waived because the Coles do not raise or brief them on appeal. *See* Fed. R. Bankr. Proc. 8010(a) (requiring appellant's brief to contain an argument, setting out the contentions with respect to issues presented, reasons therefor, and citations to authorities, statutes and record); and *In re Narowetz Mechanical Contractors, Inc.,* 99 B.R. 850, 858 n.14 (N.D. Ill. 1989) (issues not set out in appellant's opening brief deemed waived, citing Bankr. R. 8010(a)(1)).

## VI. Conclusion

The Bankruptcy Court's proposed findings of fact and conclusions of law are adopted to the extent consistent with this Order, and the Trustee's motion for partial summary judgment is granted.

The Trustee's motion [Doc. 21] to strike the Coles' reply brief, and the Coles' motion [Doc. 24] to correct citation errors in a filing, are denied as moot.

s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: <u>August 15, 2014</u>
Jefferson City, Missouri